OPINION OF THE COURT
Fuchsberg, J.
This appeal calls upon us to interpret a loan participation agreement between two large commercial lenders, plaintiff-respondent Westinghouse Credit Corporation and defendant- *563 appellant James Talcott, Inc. The essential facts are undisputed.
The participation agreement, entered into in 1974, incorporated the terms of a pre-existing line of credit agreement between Westinghouse and the developers of a Texas land project known as Padre Island. Under the arrangement Westinghouse had agreed to extend loans up to a total of $32,000,-000 in amounts geared to accounts receivable generated by the land sales consummated by Padre, who would thus be put in a position to finance its own sales on an installment basis. Padre, in turn, was to apply any payments received from its purchasers to reduce the outstanding balance of principal and interest due under its line of credit. The Westinghouse loans were secured by deeds of trust on the land and a security interest in the installment purchase contracts. The Padre-Westinghouse agreement was renewable annually at Padre’s option providing the latter was not in default either in making the money payments or in implementing the security arrangements it had undertaken.
Under the separate agreement by which Talcott became a participant, Westinghouse sold it an undivided 21.74% share (but not to exceed $5,300,000) in the loans and advances made or to be made to Padre. Paragraph 4 of the contract between the lenders also tells us that "the funds advanced by Talcott * * * [were to] bear interest at the rate of five and one-half percent (5[1]A%) per annum in excess of the 'prime rate’ ”. Pertinent too, for our purposes, is that paragraphs 5 and 8 specified that these sums were to be repaid, with interest and in proportion to Talcott’s capital contribution, out of any sums paid by Padre to Westinghouse pursuant to the terms of the contract setting up the line of credit. In addition, the loan participation agreement, by its paragraph 9, provided for certain priorities in the event of liquidation. It is around this provision that the dispute between the parties now revolves.
The genesis of the controversy was Padre’s failure, in 1976, to adhere to a prescribed plan for improving its land. This default rendered the installment land sales contracts Padre had negotiated with purchasers unenforceable, in consequence of which the value of the collateral for the WestinghouseTalcott loans was impaired. It is undisputed that by its terms the financing contract between Padre and Westinghouse would therefore have expired on September 15, 1976. Nevertheless, Westinghouse, as managing or, as otherwise described, *564 originating lender of the participating group,[1] took it upon itself to extend the line of credit agreement. Talcott, however, unwilling to consent to this waiver of the default, refused to continue and insisted instead on repayment of the advances it had already made.
For a time, Westinghouse, though knowing full well of course that Talcott would not participate in the new loans which were to be advanced under the now continuing line of credit agreement with Padre, remitted to Talcott its share of Padre’s payments of both principal and interest as these were received on the outstanding advances made before the withdrawal.[2]
But, half a year later, in March, 1977, Westinghouse brought suit, claiming that Talcott had breached the participating agreement by failing to acquiesce in the renewal of the Padre credit. In its answer, Talcott counterclaimed for the amounts it had advanced up to September 15, 1976 together with interest and sought an accounting. In due course, on cross motions for summary judgment, Special Term, in effect finding that Westinghouse was without power to negate Talcott’s refusal to continue to be bound by the agreement with Padre, held that Talcott was entitled to its pro rata share of all collections received by Westinghouse after September 15, 1976 against the loans in which Talcott had participated.
Subsequently, presumably in compliance with the judgment entered on this decision, Westinghouse made all the payments it had withheld from Talcott in the interim, except that it set off approximately $800,000 to reflect an amount Westinghouse now claimed represented the accrued interest erroneously sent to Talcott after its role as a participant had come to an end in September, 1976.
It is in this connection that paragraph 9 of the loan participation agreement takes center stage. For Westinghouse’s rationale for making the deduction for the interest payments was premised on its position that Talcott’s election to withdraw from participation in any further loans meant that all moneys it was to receive thereafter were to be paid out in accord with this provision, which reads: "9. In the event of *565 default by Borrower [Padre], or if * * * [Westinghouse] shall deem it otherwise advisable, to liquidate the respective investment of [Westinghouse] and Talcott in the loans and advances made pursuant to the Agreement, all sums collected and received by [Westinghouse and Talcott] thereon shall be applied ratably as follows: (a) to costs and expenses, including reasonably [sic] attorneys’ fees, court costs and other like items; (b) to the unpaid principal amount of the loans and advances in proportion to the respective investments of [Westinghouse] and Talcott therein; and (c) to the respective accrued interest and other charges of [Westinghouse] and Talcott.”
Using it as the prime support for a motion to resettle the order and judgment of Special Term to allow it to credit itself with the interest payments which, as Westinghouse contended, Talcott was paid in error after September, 1976, Westinghouse urged that paragraph 9 meant that Talcott was not entitled to receive interest until such time, if ever, when the full amount of the principal of the Padre loans had been repaid. For its part, Talcott, who cross-moved for summary judgment in its favor on the same question, argued that paragraph 9 was inapplicable because no "liquidation” had occurred and that Talcott, therefore, was entitled to its share of the interest on the pre-September, 1976 loans to Padre as received.
Denying plaintiff’s motion and granting the cross motion, Special Term held that "[u]nder the plain meaning of the Participation Agreement Talcott is entitled to its full share of payments on account of principal and interest until the principal amount of its participation is paid in full.” On Westinghouse’s appeal, however, the Appellate Division reversed, concluding that paragraph 9 mandated the deferral of any interest payments to Talcott until contributions of principal made by the other participants had been repaid. For the reasons that follow, we disagree.
Preliminarily, putting aside paragraph 9, essentially the sole underpinning on which Westinghouse and the Appellate Division relied, we note that the other paragraphs that could be said to come into play in this case, i.e., paragraphs 4 and 5, leave little room for conjecture.
Thus, paragraph 4 unequivocally announces that "the funds advanced by Talcott pursuant to this participation agreement shall bear interest” (emphasis supplied). Although it would *566 have been a simple matter for these sophisticated lenders to have expressed such an intention if the provision for interest, after all a basic term in the world of finance, was to be read more or less than literally, this commitment by Westinghouse to Talcott is not qualified in any way. Nor can the application of its explicit undertaking be avoided because Talcott did not participate in any further loans made by Westinghouse and its other cohorts after September 15, 1976 since, on that date and during the ensuing period, "funds advanced by Talcott” were still outstanding. Consequently, so far as paragraph 4 is concerned, Talcott was no less entitled to collect interest than were the other participants in these loans, including Westinghouse itself, which in fact did continue to draw interest on amounts advanced prior to September 15, 1976. Notably, during the entire period after this date, Padre’s obligation to pay both interest and principal to Westinghouse, the lead lender, continued undiminished. Under paragraph 5, therefore, Westinghouse had to "make proportionate distribution to Talcott of all payments actually received by it for application on account of principal [and] interest” (emphasis supplied).
Turning then to paragraph 9, we begin with the observation that its proviso that the accrual of interest be postponed until the principal will have been recovered is not decisive of the issue which confronts us. Such provisions are consistent with accepted accounting practice pursuant to which they are frequently inserted in loan or other investment agreements. Their recognized purpose, when economically prudent, is to allocate cash flow to principal in order to forestall tax liability for what otherwise in the end may turn out to have been interest income on advances of money which, because of an ultimate shortfall in recoupment of the principal, will be but a way station to an ultimate net loss (Statement of Position on Accounting Practices of Real Estate Investment Trusts [SOP 75-2, June 27, 1975]).
Moreover, to focus on the order of the priorities assigned by paragraph 9 reveals that its dominant note is a concern with allocation as between the participants of any sums received upon a "liquidation”. Without essaying an exact definition of that term in other contexts, it seems obvious that, whatever it may otherwise mean, in this case it clearly contemplated a situation involving retrieval of all or the salvageable part of the investment of both Westinghouse and Talcott. Indeed, in the relatively short, one-sentence paragraph that is paragraph *567 9, in spelling out the disposition of sums received in "liquidation”, reference is twice made to the participants. It does so once with respect to principal and once with respect to interest. Each time, Westinghouse and Talcott are referred to by name and each time in the conjunctive.
Obviously, it was antithetical to a "liquidation” for Westinghouse to reach its decision to continue to carry out its commitment to Padre, actually increasing its advances under the line of credit agreement, not an unusual attitude for a lead lender intent on trying to resuscitate its larger investment and maintain its relationship with its borrower (see Simpson, Loan Participations: Pitfalls for Participants, 31 Bus Law 1977, 1981, 2019-2020). But, however, motivated, it simply was not a "liquidation”.
All the more was this so when Talcott exercised its right to withdraw. Then, Westinghouse having chosen to continue without Talcott, "liquidation” under paragraph 9, however defined, became an impossibility. There no longer could be, to quote paragraph 9, any "liquidation] [of] the respective investment of [Westinghouse] and Talcott” (emphasis supplied).[3] In short, with Talcott no longer in, the clause was out.
It is therefore bootless to make the further argument, as Westinghouse does, that payment of interest to Talcott unfairly allows Talcott to extricate itself from the venture at the expense of the other lending participants. There having been no decision to liquidate within the unambiguous language of the agreement, there was no need for the prioritization of receipts among investors in order to guarantee that the principal at least would be recovered. Whatever inequity may be said to result stems rather from Westinghouse’s position that it has the right to withhold interest payments from any participant who declines to participate in another, albeit less secure, series of loans in contravention of the participation agreement.
All in all, the unambiguous terms of the loan participation agreement leave us with the conviction that the only construction which can fairly be placed on the agreement entitles Talcott to the interest payment.
*568 Accordingly, the order of the Appellate Division should be reversed and the order and the judgment of the Supreme Court should be reinstated.
Chief Judge Cooke and Judges Jasen, Gabrielli, Jones, Wachtler and Meyer concur.
Order reversed, with costs, and the order and the judgment of Supreme Court, New York County, reinstated.

. Apparently there were other lenders to whom Westinghouse had separately sold other participating interests.

. The payments of interest and principal to Talcott continued through December, 1977 although modification in the contractual arrangements between Westinghouse and Padre resulted in the borrower’s remitting Talcott’s pro rata share directly to it.

. The punctuation of paragraph 9 is somewhat awkward largely because of a seemingly unnecessary comma after the word "advisable”. While most probably this is a printing error, whether the comma is present or absent, it makes no difference to our construction of the paragraph as requiring liquidation of Westinghouse’s investment as well as Talcott’s.